**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

LARRY ZUBROD, et al.,

          Plaintiffs,

vs.

SHAYNE HOCH, et al.,

          Defendants.

No. 15-CV-02065-CJW

**MEMORANDUM OPINION AND
ORDER**

———————————

**Table of Contents**

I.    *INTRODUCTION* ................................................................ 2

II.   *PROCEDURAL HISTORY* ................................................ 2

III.  *UNDISPUTED FACTS* ..................................................... 4

IV.  *SUMMARY JUDGMENT STANDARDS* ......................... 15

V.   *EXCESSIVE USE OF FORCE STANDARDS* ................. 16

VI.  *EXCESSIVE USE OF FORCE AND TASERS* ................ 19

VII. *QUALIFIED IMMUNITY* ............................................... 22

VIII. *DISCUSSION* .................................................................. 23

   A.   *Whether Deputy Hoch Used Excessive Force* ............................... 24

   B.   *Whether Deputy Hoch is Entitled to Qualified Immunity* ................. 34

   C.   *Whether Deputies Short and Smith are Liable for Failing to Intervene* ............... 36

   D.   *Whether Sheriff Langenbau and Worth County Are Vicariously Liable* .............. 38

   E.   *Jurisdiction Over Plaintiffs' State Law Claims* ............................... 40

   F.   *Plaintiffs' Loss of Consortium Claim* .......................................... 41

IX.  *CONCLUSION* ................................................................ 41

## I.     INTRODUCTION

This matter is before the Court pursuant to defendants' motion for summary judgment.   Doc. 41.   Plaintiffs resist the motion for summary judgment.   Doc. 68. Defendants filed a reply brief.   Doc. 86.   On November 29, 2016, the Court heard oral argument on the motion.   For the reasons that follow, the Court grants defendants' motion for summary judgment.

## II.     PROCEDURAL HISTORY

On July 29, 2015, plaintiffs Larry and Cheryl Zubrod, individually, and as Administrators for the Estate of Michael Zubrod (Zubrod), commenced this lawsuit by filing a complaint in this Court.   Doc. 2.   Plaintiffs generally allege that on September 22, 2013, Worth County Sheriff's deputies responded to a report of a domestic disturbance at a house in Northwood, Iowa.   Inside, they encountered Zubrod attacking a woman with a hammer.   Plaintiffs allege the deputies overpowered Zubrod after a struggle, during which the deputies repeatedly used a Taser on Zubrod, both before and after deputies had placed him in handcuffs.   Plaintiffs allege that after handcuffing Zubrod, they discovered Zubrod was no longer breathing.   Hospital personnel later pronounced Zubrod dead.

Plaintiffs' complaint consists of seven counts.   In Count I, plaintiffs bring a Title 42, United States Code, Section 1983 claim against Deputy Shayne Hoch (Deputy Hoch) alleging a violation of Zubrod's Fourth Amendment Rights.   Doc. 2, at 5-7.   In this count, which plaintiffs subtitle "First Grouping of Taser Bursts," they allege Deputy Hoch violated Zubrod's constitutional rights "by utilizing excessive force while punitively and sadistically using a Taser on him at length while he lay in a prone position

on the ground and posed no reasonable risk of harm or safety to any officer or other individuals present." *Id.*, at 5-6.

In Count II, plaintiffs bring another Section 1983 claim against Deputy Hoch, again alleging a violation of Zubrod's Fourth Amendment rights. Doc. 2, at 8-10. In this count, which plaintiffs subtitle "Second Grouping of Taser Bursts," they allege Deputy Hoch again violated Zubrod's constitutional rights "by utilizing excessive force while punitively and sadistically using a Taser on him multiple times at length while he lay restrained with handcuffs and otherwise posed no reasonable risk of harm or safety to any officer or other individuals." *Id.*, at 8.

In Count III, plaintiffs bring a Section 1983 claim against Deputies Isaac Short (Deputy Short) and John Smith (Deputy Smith), alleging they also violated Zubrod's Fourth Amendment rights. Doc. 2, at 10-12. Subtitled "Bystander Liability – Failure to Intervene" in Count III, plaintiffs allege Deputies Short and Smith violated Zubrod's constitutional rights when they observed Deputy Hoch use excessive force and failed to intervene.

In Count IV, plaintiffs bring a state law assault and battery cause of action against Deputy Hoch. Doc. 2, at 13.

In Count V, plaintiffs allege Deputies Hoch, Short, and Smith were negligent, causing Zubrod's injuries and death. Doc. 2, at 14.

In Count VI, plaintiffs bring a claim against Sheriff Jay Langenbau (the Sheriff) and Worth County (the County), under the respondeat superior doctrine, alleging they are vicariously liable for the negligent actions of Deputies Hoch, Short, and Smith. Doc. 2, at 14-15.

Finally, in Count VII, plaintiffs bring a loss of consortium claim against all defendants, alleging defendants caused plaintiffs to lose Zubrod's services, companionship, and society.   Doc. 2, at 15-16.

## III.   UNDISPUTED FACTS

Based on the parties' respective filings,[1] the Court finds that the facts set forth below, unless otherwise noted, are undisputed for purposes of the motion for summary judgment.

### Relevant Parties.

Plaintiff Larry Zubrod was a resident of Chickasaw County, Iowa, and is the father of Michael Zubrod.   Cheryl Zubrod was a resident of Chickasaw County, Iowa, and is the mother of Michael Zubrod.   Together, Larry and Cheryl Zubrod serve as administrators of Michael Zubrod's estate.   Defendant Deputies Hoch, Short, and Smith were all Iowa residents and employees of the Worth County Sheriff's Office.   Defendant Jay Langenbau was an Iowa resident and Sheriff of Worth County.   Worth County was a county corporation existing under the laws of the State of Iowa and operated the Worth County Sheriff's Office.

---

[1] Plaintiffs objected to a number of defendants' statements of undisputed fact, arguing they failed to comply with Local Rule 56(a), which provides: "Each individual statement of material fact must be concise [and] numbered separately . . .." LR 56(a).  Plaintiffs argue that many of defendants' numbered paragraphs contain numerous statements and asks the Court to strike these statements.  The Court denies plaintiffs' requests.  Defendants' statements of undisputed facts are relatively concise (though many contain gratuitous descriptions and conclusions) and substantively comply with the letter and spirit of Local Rule 56(a).

At the time of these events, Michael Zubrod was 5'8" and weighed 196 pounds. Deputy Short stood 5'9" and weighed approximately 155 pounds. Deputy Hoch was 5'8" or 5'9" tall and weighed between 210 and 220 pounds. Deputy Smith was 5'7" tall and weighed approximately 220 pounds. None of the deputies knew Zubrod from before this night and had no personal knowledge about his drug use or mental history.

*Relevant Events.*

On the night of September 22, 2013, Deputy Short was on duty patrolling in Northwood, Iowa.[2] At approximately 11:23 p.m., Deputy Short advised the Worth County dispatch operator that concerned citizens had stopped him to report they heard screaming from a neighbor's house located at the intersection of 3rd and 4th Streets. When Deputy Short arrived at the house, he heard a woman screaming from inside the house. He told dispatch the address of the house and described it as Sheila Olson's house; in fact, he was at Rhonda Schukei's house, Olson's sister.[3] Deputy Short was aware of some law enforcement intelligence suggesting that Rhonda Schukei may have been a drug user and her residence was suspected as being a drug house, meaning law enforcement officers believed drug use activity may be occurring in the house. Law enforcement officers believed methamphetamine to be the number one drug of abuse in Northwood, Iowa, in 2013.

---

[2] Deputy Short was a relatively new law enforcement officer, having been on the force only a few months and was not yet certified because he had not yet attended the law enforcement academy. He had received only 45 days of field training and had been conducting solo patrols since the middle of July.

[3] Rhonda Schukei's house (location of the events at issue) was very close to Sheila Olson's house.

Deputy Short told dispatch he was going inside and requested backup. At approximately 11:29 p.m., Deputy Hoch radioed dispatch that he was en route to assist Deputy Short. Dispatch attempted to contact Deputy Hoch twice at approximately 11:30 p.m., but was unable to reach him by radio. Dispatch radioed Deputy Hoch to "step it up," which he understood to mean to rush more quickly to the scene. Deputy Hoch sped to the scene.

At some point while entering the house, Deputy Short drew his handgun out of its holster. The house had two stories. Deputy Short did not encounter anyone on the ground floor. He heard a woman screaming from upstairs, so he climbed the stairs. Once upstairs, Deputy Short heard the screams coming from the bedroom facing the front of the house. The door to the bedroom was shut. Deputy Short tried to open the door, but it was locked. He kicked in the door.

The lights were off in the bedroom, but by moonlight coming in through the window, Deputy Short saw Zubrod standing above someone on the ground and saw that Zubrod had something in his hand. Deputy Short found a light switch and turned on the light. Deputy Short saw Rhonda Schukei laying face up on the ground. She was bleeding. Zubrod was above her striking her in the face with a hammer. Zubrod was himself bloody. Zubrod was screaming "die bitch, you're gonna die!"

Deputy Short managed to radio in a "10-33" call into dispatch, which is an emergency code essentially requesting all law enforcement personnel to rush to his aid. Deputy Hoch, still en route to the house, attempted to ask Deputy Short if he was okay, but could not make out Deputy Short's reply.

Deputy Short, still holding his handgun, yelled at Zubrod to step away from the victim. That was the last thing the victim remembered from the scene.[4] Zubrod stepped away from the victim, dropping the hammer. Deputy Short holstered his handgun at that point and withdrew his Taser. Zubrod then said something about finding a gun and began to reach down under the bed. When Zubrod stood back up, however, he did not have anything in his hands. Zubrod then reached over to the headboard, grabbed a pair of scissors, and tried to kill the victim by stabbing her in the neck as she lay on the floor, leaving the scissors sticking out of her neck. Deputy Short fired his Taser, but only one of the two barbs struck Zubrod in the left arm; the other barb missed.[5] The Taser can cause neuromuscular incapacitation only if both barbs make contact with the body. Deputy Short pulled the cartridge from the Taser in an attempt to use the Taser in drive-stun mode.

At this point, Zubrod grabbed a pair of needle-nose plyers from a dresser and came at Deputy Short. Zubrod began to physically fight Deputy Short. During the struggle, Deputy Short either dropped the Taser or it was knocked out of his hands. There is no evidence Deputy Short was ever able to make contact with the Taser on Zubrod's body.[6]

---

[4] The victim, Rhonda Schukei, underwent twenty hours of reconstructive surgery to repair her shattered face; she continues to suffer brain damage from the attack.

[5] Plaintiffs insist that Deputy Short hit Zubrod with both Taser barbs. Doc. 68-2, ¶29. The Court finds no support in plaintiffs' citations to the record to support this assertion. In any event, it is not material as it is undisputed that whether Deputy Short hit Zubrod with one or two Taser barbs, Deputy Short did not successfully tase Zubrod.

[6] Plaintiffs claim Deputy Short "was able to drive stun Michael Zubrod on the upper left torso." Doc. 68-2, ¶ 33. Again, the Court could find no support for this contention in plaintiffs' citations to the record, and finds the uncontested evidence clearly shows Deputy Short was never able to drive-stun Zubrod.

The struggle spilled out into the hallway.   During the struggle, Deputy Short was able to steer Zubrod's body further away from the victim and part way into another bedroom.   The two of them went to the ground in the doorway of another bedroom. Deputy Short was able to get Zubrod on his back and get on top of Zubrod.   Deputy Short was able to hold Zubrod's wrists.   Zubrod fought back, attempting to buck Deputy Short off of him and attempted to stab Deputy Short in the leg with the plyers.   Deputy Short was able to force or "rip" the plyers out of Zubrod's hand.   Zubrod continued to resist and attempted to get away from Deputy Short.   Deputy Short testified that Zubrod had a look of pure evil in his eyes and was grunting and making noise throughout the struggle.

Zubrod was covered in sweat and the victim's blood, making it difficult for Deputy Short to hold onto Zubrod.   Zubrod continued to scream and yell, including "Die, bitch, you're gonna die."   Deputy Short placed a knee on Zubrod's chest, allowing him enough leverage to secure a handcuff on Zubrod's left wrist.   Zubrod continued to resist, however, and Deputy Short was unable to secure the handcuffs to Zubrod's other wrist. A loose handcuff on one wrist is considered a weapon because a suspect can use it to harm another person in a struggle.

As Deputy Short continued to struggle to stay on top of Zubrod and control his hands, Zubrod taunted Deputy Short, stating that Deputy Short was getting tired but that he, Zubrod, was not.   Deputy Short considered using pepper spray, but decided against it because in the enclosed space, it would affect him as much as Zubrod.   Deputy Short also considered using his ASP baton, but again decided against it because if he lost control of the weapon Zubrod could use it against Deputy Short or the victim.   Deputy Short struggled to stay on top of Zubrod and hold on to his wrists for about eight minutes before

Deputy Hoch arrived.   Deputy Short later testified that he was getting both mentally and physically tired trying to secure Zubrod.[7]

At some point during this struggle, Deputy Short was able to radio dispatch to state there was a lot of blood and there was one person on the ground.   Dispatch radioed Northwood Rescue to respond to the scene.   Deputy Short radioed that medical personnel should not enter the house because he did not have Zubrod under control. When Deputy Hoch arrived at the scene, he saw rescue personnel outside Sheila Olson's house and realized Deputy Short had incorrectly described whose house he was in when initially radioing dispatch.   Deputy Hoch, however, entered the correct house and went up to the second floor.   There, Deputy Hoch saw the victim covered in blood and moaning in one bedroom, and saw Deputy Short struggling to stay on top of and keep control of Zubrod partway in another bedroom.   Deputy Hoch radioed for medical personnel to come to the victim's aid immediately, despite the fact Zubrod was not yet secured.

Deputy Hoch ordered Zubrod to turn over and place his hands behind his back. Zubrod attempted to spit, but the spit mostly fell on Zubrod's own face.   As Deputy Short let go of Zubrod in order to handcuff him and allow Zubrod to turn over in compliance with Deputy Hoch's order, Zubrod got lose and stood up.   At this point,

---

[7] Plaintiffs claim Deputy Short "maintained a position of control over Michael Zubrod until Hoch arrived to the second floor of Schukei's residence."  Doc. 68-2, ¶42.  *See also* Doc. 68-2, ¶ 43 ("When Hoch arrived, Short had Michael Zubrod under control . . ..");  Doc. 68-2, ¶ 47 ("Despite Short having good control over Michael Zubrod, Hoch sought to drive stun Michael Zubrod after seeing Schukei's condition.").   The Court does not find that plaintiffs' citations to the record support a finding that Deputy Short ever had Zubrod under control.   Deputy Short, through extreme effort, was able to keep Zubrod on the ground, prevent Zubrod from stabbing him with plyers, and protect the victim, but at best, Deputy Short had ahold of Zubrod's wrists. The lack of "control" is reflected by the uncontested fact that Deputy Short was only ever able to secure handcuffs to only one of Zubrod's wrists.

Zubrod and the deputies were in the other bedroom (a bedroom down the hall from the bedroom where the victim lay). Deputy Hoch pulled out his Taser and warned Zubrod that he was going to tase him if Zubrod did not comply with his commands. Zubrod came at Deputy Hoch, saying "die" and "I'm gonna kill you." Deputy Hoch backed up. At this point, Deputy Hoch and Zubrod were only three to four feet away from each other; the ideal distance to deploy a Taser is twelve to eighteen feet. When Zubrod did not comply with commands, Deputy Hoch shot at Zubrod with the Taser. One barb hit Zubrod, but other barb hit his leather belt. A later autopsy would reveal that this second barb did not come into contact with Zubrod's skin. Without contact by both barbs, the Taser had no effect on Zubrod.

At this point, the fight continued, and both deputies went "hands on" Zubrod, meaning both of them attempted to use their hands to physically control Zubrod. Deputy Hoch was pushed back into a window. Either as a result of breaking the window or from a prior break, there was some glass on the floor.[8] Deputy Hoch was concerned Zubrod could use the glass fragments as a weapon.

At approximately 11:40 p.m., Deputy Smith arrived. Deputy Smith could hear scuffling over Deputy Short's and Hoch's radios. Deputy Smith entered the house and went upstairs where he saw Deputies Short and Hoch hands-on with Zubrod. The Deputies had Zubrod on his back on a pile of clothes at this time. Zubrod was actively resisting the deputies, kicking out and flailing one arm with a handcuff attached to it. Deputy Hoch instructed Deputy Smith to use his Taser on Zubrod.[9] When Deputy Smith

---

[8] There is a factual dispute about whether Deputy Hoch broke the window during this struggle and whether there was actually glass on the floor. Plaintiffs also dispute that there was glass on the floor. For purposes of summary judgment, the Court finds these facts immaterial.

[9] Plaintiffs assert that "Smith attempted to use his Taser, at Hoch's request, on Michael Zubrod

pulled out his Taser and was ready to shoot, Deputies Short and Hoch released their grip on Zubrod to allow Deputy Smith to deploy his Taser. Zubrod got to his feet and moved to a window. Deputy Smith shot his Taser at Zubrod, but it malfunctioned and would not deploy. When he pulled the trigger, nothing happened, so he dropped the Taser. Zubrod pulled down a curtain rod with the curtain attached and began swinging it at the deputies.[10] Zubrod said something about "the devil" and "getting" Deputy Smith and some other "gibberish" which Deputy Smith did not understand. Both Deputies Hoch and Smith believed that Zubrod might be under the influence of drugs or had some type of mental health problem.

All three deputies then went hands-on with Zubrod again, attempting to control him through brute force. During this struggle, Deputy Hoch was able to load another cartridge into his Taser. Deputy Hock shot Zubrod with the Taser in Zubrod's thigh at close range. Because the barbs entered Zubrod's skin very close to each other, the Taser could not cause neuromuscular incapacitation. All three deputies continued to struggle with Zubrod to get him under control.[11]

---

while Michael Zubrod was restrained on the ground wrapped in a curtain." Doc. 68-2, ¶61. The Court finds no support for this factual assertion in plaintiffs' record citations.

[10] Deputy Hoch recalls Zubrod seated on the ground when he was swinging the curtain rod. For purposes of summary judgment, the Court finds it immaterial whether Zubrod was standing or sitting when swinging the curtain rod.

[11] In statements to law enforcement officers and in depositions, there are some factual inconsistencies regarding which deputies were trying to control Zubrod's feet and which were trying to control his upper body. The Court finds these factual disputes immaterial; this struggle was fluid and who was attempting to control Zubrod's feet at any given time is irrelevant.

By this time, at least some rescue personnel had entered the house and climbed the stairs to the second floor to attend to the victim.[12] One such rescue worker, Dennis Paulson, stationed himself in the hallway between the two bedrooms to act as a last line of defense in case Zubrod got loose and came after the victim again. At one point, he looked into the bedroom, saw Zubrod with a handcuff on only one wrist, and saw the deputies struggling to get control of Zubrod.

Deputy Hoch then tried to use his Taser in drive-stun mode. This involves placing the barrel of the Taser directly against the suspect's body. Drive-stun mode causes a burning sensation, as opposed to neuromuscular incapacitation, and is used as a method of pain compliance. Because the barbs were still attached to Zubrod, however, when Deputy Hoch tried to use the Taser in drive-stun mode, it was effectively used in a hybrid mode that could, in theory, cause neuromuscular incapacitation. Deputy Hoch attempted to place the Taser against Zubrod's body and pulled the trigger multiple times, all the while ordering Zubrod to comply with commands to turn over so deputies could handcuff him. Zubrod continued to resist, attempting to push the Taser away from him, and refusing to comply with commands. Ultimately, the deputies were able to handcuff Zubrod behind his back. Deputy Hoch then left the house to get foot shackles to secure Zubrod's feet.

---

[12] Deputy Short testified that, ideally, law enforcement personnel would not allow rescue personnel into a scene until they had control of a dangerous suspect. Plaintiffs argue that the circumstantial evidence shows that rescue personnel did not enter the house until the deputies had Zubrod handcuffed and at that point, the rescue personnel heard a Taser being deployed. As will be explained later, the Court does not find there is admissible evidence or factual support for this conclusion. Plaintiffs' position is also inconsistent with their admission that rescue personnel were in the house attending to the victim in one room while the deputies were still fighting to control Zubrod in another room. Doc. 68-1, ¶53.

Records from Deputy Hoch's Taser indicates he pulled the trigger ten times for a total of 53 seconds during a period of three minutes and fifteen seconds during the struggle. Because Zubrod was attempting to push the Taser away from him at the same time, it is not known how many times the Taser had contact with Zubrod when Deputy Hoch pulled the trigger. At no point, however, did the Taser cause neuromuscular incapacitation.

The Court has reviewed the video from Deputy Hoch's and Deputy Smith's Tasers. It is difficult to obtain a clear view from the videos. Both Tasers are understandably moving constantly, and the images are sometimes very close to objects and other times farther away. At one point in Deputy Smith's video, it shows Zubrod on his back, appearing to hold his arms and legs out so as to prevent the deputies from holding him. In Deputy Hoch's Taser video, the Court observed Zubrod constantly moving about while on his back, while it appeared deputies are attempting to control his legs. Deputies repeatedly commanded him to turn over, and Zubrod is grunting. The Court heard a Taser being discharged more than once on the video, but it is too difficult to tell from the sound how many separate times the Taser is discharged. The Court heard what appears to be Zubrod making loud noises; whether these are the result of pain or anger is unknown and unknowable. Although plaintiffs claim Zubrod called for a doctor on the video, the Court has not heard the word doctor despite viewing and listening to the video more than a dozen times. The Court did hear a deputy say "get him again." Deputy Short testified that he did not hear the audible sounds of the Taser being used during the struggle because he was physically and mentally exhausted and was focused on trying to obtain control over Zubrod. There is no video from the first two times Deputy Hoch pulled the trigger on his Taser, although the Taser camera is supposed to start recording once the safety is turned off.

A short time later, deputies noticed Zubrod was not breathing. At approximately 12:09 a.m., a call was made for another ambulance and CPR was started on Zubrod. Rescue personnel took Zubrod to Mercy Medical Center where at 1:17 a.m., he was pronounced dead. Following an autopsy, Medical Examiner Jonathon Thompson opined that the cause of death was "cardiac arrhythmia following altercation with police in the setting of acute methamphetamine intoxication." The Medical Examiner opined that "[t]he role the conduced energy device (Taser) played in the death is unknown."

During the autopsy, the Medical Examiner found two sets of Taser burn injuries on Zubrod's body, and punctures by three Tazer barbs (two in the thigh close together, and on in his arm). He opined that it was unlikely, but possible, that marks on Zubrod's left chest area were Taser burns. The Medical Examiner also found a Taser barb connected to Zubrod's leather belt. Although that barb penetrated the belt, there was no indication it punctured Zubrod's underlying jeans, underwear, or skin.

The Medical Examiner opined that the Taser might have played a role in Zubrod's death. Plaintiffs' expert, Dr. Daniel Spitz, opined that the repeated use of the Taser on Zubrod was a contributing factor in his death. Dr. Spitz identified three Taser burns on Zubrod's body.

A toxicology analysis showed methamphetamine and methamphetamine metabolite, as well as naloxone, in Zubrod's blood. Later investigation revealed that Zubrod was high on methamphetamine on the night of September 22, 2013, and had been using more methamphetamine during September 2013 than he usually did.

The standard time used in lab testing of a Taser is 15 seconds, and no test exceeded 45 seconds. The Taser company provides warnings on the use of a Taser, which were reflected in the Worth County's Taser policy in September 2013. It warns that using the Taser in drive-stun mode for pain compliance may have no effect on a mentally

disturbed person. It also warns that the cumulative exposure to a Taser may cause an increased risk of death or serious injury. Finally, it warns these risks may be enhanced in individuals under the influence of drugs.

## IV.  SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2016). A movant must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation omitted). "An issue of material fact is genuine if it has a real basis in the record[,]" *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (internal citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question[,]" *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing version of the truth at trial." *Anderson*, 477 U.S. at 248-49 (internal quotation marks and quotation omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88 (internal citation omitted). *See also Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record … that no reasonable jury could believe' them.") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or attempt to determine the credibility of witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## V.      *EXCESSIVE USE OF FORCE STANDARDS*

The Fourth Amendment's prohibition against unreasonable searches and seizures includes the right to be free from law enforcement officers using excessive force in effectuating an arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002). "Police officers undoubtedly have a right to use

some degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (internal citation omitted). *See also Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.") (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009)). "[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown*, 574 F.3d at 499.

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006) (quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004) and *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994)) (internal quotation marks omitted). Courts evaluate the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This is because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 397. *See also Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015) ("The dispositive question is whether the officer's conduct was objectively reasonable under the circumstances, as judged from the perspective of a reasonable officer on the scene at the time the force was applied.") (internal citation omitted).

The reasonableness inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. *See also Peterson v. Kopp*, 754 F.3d 594, 600 (8th Cir. 2014) ("An officer's use of force will violate the Fourth Amendment if it is not 'objectively reasonable.'") (quoting *Graham*, 490 U.S. at 397). In conducting this analysis, a court must consider the totality of the circumstances. *Cook v. City of Bella Villa*, 582 F.3d 840, 849 (8th Cir. 2009). Circumstances relevant to the reasonableness of an officer's conduct include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Schoettle v. Jefferson Cty.*, 788 F.3d 855, 859 (8th Cir. 2015) ("When determining whether unreasonable force was used, courts must give 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'") (quoting *Graham*, 490 U.S. at 396).

The degree of injury suffered by the plaintiff "is certainly relevant insofar as it tends to show the amount and type of force used." *Chambers*, 641 F.3d at 906. A causal connection between an event and an injury may be inferred in cases in which a visible injury or a sudden onset of an injury occurs. *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002) (internal quotation marks and citation omitted). "The degree of injury should not be dispositive, [however,] because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted." *Chambers*, 641 F.3d at 906. Rather, the analysis focuses "on whether *the force applied* is reasonable from the

perspective of a reasonable officer on the scene at the time the force is used." *Id.* (emphasis in original).

## VI. EXCESSIVE USE OF FORCE AND TASERS

The case law analyzing whether the use of a Taser during an arrest constitutes excessive force has evolved over time as use of the technology has become more commonplace. Generally speaking, the case law draws a distinction between the use of a Taser against a person passively resisting arrest and one who is physically resisting arrest. Courts have generally found use of a Taser against an arrestee who is only passively refusing to comply with officers' commands constitutes an excessive use of force.

For example, in *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009), the Eighth Circuit found that police officers were not entitled to qualified immunity on an excessive force claim after using a Taser on a female passenger in a car. *Id.* at 494. The officers suspected her of a misdemeanor open bottle violation. *Id.* at 496. The passenger was sitting in the car and talking on her cell phone (to a 911 operator), was not fleeing or actively resisting, and, the Court concluded, "posed at most a minimal safety threat" to the officers. *Brown*, 574 F.3d at 497–98. The Court noted that there was "nothing to indicate that [the officer] was faced with the need to make any split-second decisions, nor can the circumstances fairly be described as constituting a 'tense, uncertain, and rapidly evolving' situation." *Id.* at 497.

On the other hand, courts have found the use of a Taser against an arrestee who is actively and physically resisting arrest does not constitute an excessive use of force. As the Sixth Circuit Court of Appeals concisely concluded: "[c]ases from this circuit and others, before and after May 2007, adhere to this line: If a suspect actively resists arrest

and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). *See also*, *e.g.*, *Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012) (affirming dismissal of excessive-force claim where plaintiff was Tasered after failing to produce hands for cuffing, despite plaintiff's assertion he moved his hands "merely as an effort to breathe").

For example, in *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892 (8th Cir. 2014), the Eighth Circuit held that the repeated use of a Taser on an arrestee did not violate the arrestee's clearly established rights. De Boise suffered from schizophrenia and, on the night of his arrest, became delusional and physically aggressive. *Id*. at 894. Six officers arrived on the scene, at which time De Boise's mother informed the officers that she had a firearm in the house and that her son was schizophrenic. *Id*. at 894–95. The officers heard loud noises from inside the house, including screaming, glass breaking, and heavy furniture being thrown, after which De Boise exited the house naked and referred to himself as God. *Id*. at 895. De Boise initially complied with instructions to lie face down on the ground, but when an officer approached, De Boise jumped to his feet, clenched his fists, and glared at an officer. *Id*. The officers instructed De Boise several times to lie down, but De Boise refused. *Id*. The officers tasered De Boise, but he continued to struggle and ignore commands. *Id*. The officers tasered De Boise eight times and used a Taser on him in drive-stun mode twice, and ultimately injected him with a sedative to subdue him. *Id*. at 895–96. De Boise suffered cardiac arrest and died. *Id*. at 896. The Eighth Circuit explained:

> Although we have determined that non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers, [ ] we have yet to determine whether a violent subject, acting aggressively toward officers, has a clearly established right to be free from multiple tasings . . ..

20

Indeed, in 2008, case law related to the use of tasers was still developing . . .. And, Appellants point to no previous case that could be said to have clearly established the unconstitutionality of the officers' actions here. Accordingly, the state of the law would not have placed "an officer on notice that he must limit the use of his taser in certain circumstances, even though the subject continues to struggle and resist."

*De Boise*, 760 F.3d at 897 (internal citations omitted). *See also Carpenter*, 686 F.3d at 649-50 (holding that officers did not use excessive force when they twice used a Taser against an arrestee who "continued to resist" arrest by physically fighting and "bucking" in an effort to throw off a deputy attempting to subdue him); *Cook*, 582 F.3d at 849-52 (finding officer's use of a Taser on a passenger who got out of his wife's vehicle to confront an officer and did not obey commands was not an excessive use of force); *Clark v. Ware*, 873 F. Supp.2d 1117, 1122-1123 (E.D. Mo. 2012) (holding that, in cases where plaintiffs are tasered "while actively resisting arrest by physically struggling with, threatening, or disobeying officers," courts either find that no constitutional violation occurred or that the right not to be tasered while resisting arrest was not clearly established when the incident happened).

Cases have also addressed the use of Tasers in the so-called drive-stun mode. Generally, the courts have found law enforcement officers can use a Taser in drive-stun mode, even against a passively resisting suspect in order to obtain compliance. For example, in *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 728 (7th Cir. 2013) (holding that police officer did not violate clearly established law in 2007 by using the Taser in drive-stun mode several times until the handcuffed plaintiff, who was actively resisting arrest, was subdued); *Buckley v. Haddock*, 292 Fed. App'x 791, 792-93, 796 (11th Cir. 2008) (unpublished) (finding no excessive force when officer used Taser in drive-stun mode against a handcuffed subject who was lying on the ground, refusing to stand and

crying). *But see Mattos v. Agarano*, 661 F.3d 433, 444-46 (9th Cir. 2011) (en banc) (determining that use of Taser in drive-stun mode against motorist who refused to sign a speeding ticket was excessive force). But the Eighth Circuit Court of Appeals has held otherwise in at least one case.

## VII. QUALIFIED IMMUNITY

Even if a court finds officers use excessive force in effectuating an arrest, it does not end the inquiry. Law enforcement officers are entitled to qualified immunity unless they violate "clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). That is, they are "shielded from liability for civil damages so long as they did not violate a clearly established right that a reasonable person would have known." *Ziesmer v. Hagen*, 785 F.3d 1233, 1237 (8th Cir. 2015) (internal citation omitted). "Broadly speaking, '[t]he right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment.'" *Peterson*, 754 F.3d at 600 (quoting *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013)). More narrowly speaking, however, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted). *See also Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) ("While there is no requirement that the very action in question has previously been held unlawful, [a plaintiff] can succeed only if earlier cases give [the officer] fair warning that his alleged treatment of [the plaintiff] was unconstitutional.") (internal quotation marks and citation omitted). *See also Meloy v. Bachmeier*, 302 F.3d 845, 848 (8th Cir. 2002) ("Although earlier cases need not involve fundamentally or

materially similar facts, the earlier cases must give officials fair warning that their alleged treatment of the plaintiff was unconstitutional.") (internal quotation marks and citation omitted).

Thus, in determining whether a law enforcement officer is entitled to qualified immunity, "[t]he relevant inquiry is whether existing precedent placed the conclusion that [the officer] acted unreasonably [under the circumstances] 'beyond debate.'" *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In conducting this inquiry, it is important that the Court not conduct its analysis "at a high level of generality" but, rather, analyzes whether the officer's conduct was clearly beyond debate within "'the specific context of the case.'" *Mullenix*, 136 S. Ct. at 311 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004)).

## VIII. DISCUSSION

There are several questions the Court must answer to determine if summary judgment is appropriate. First, did Deputy Hoch use excessive force by use of his Taser at any point during his encounter with Zubrod. Second, if Deputy Hoch did use excessive force, is he, nevertheless, entitled to qualified immunity? Third, if Deputy Hoch did use excessive force, are Deputies Short and Smith liable for failing to intervene? Fourth, should the Court find the Sheriff or Worth County vicariously liable for the deputies' conduct. Fifth, if the Court finds summary judgment appropriate on plaintiffs' Section 1983 claims, should it exercise jurisdiction over the remaining state law claims? Finally, what happens to plaintiffs' loss of consortium claim if the Court grants summary judgment on the underlying federal counts? The Court will address each issue in turn.

### A. Whether Deputy Hoch Used Excessive Force

The first question is whether there is a genuine issue of material fact about whether Deputy Hoch used excessive force in the use of a Taser while attempting to place Zubrod under arrested.   Considering the totality of the circumstances in the light most favorable to plaintiff, the Court finds there is no genuine issue of material fact, and that Deputy Hoch did not use excessive force.

This case involved efforts by officers to arrest a man for attempted murder after he smashed in the face of a woman with a hammer and stabbed her in the neck with scissors.   When Deputy Hoch came upon the scene, he saw the bloody and moaning woman on the floor of a bedroom, and Deputy Short struggling to exert control over Zubrod.   Plaintiffs mischaracterize the state of affairs when Deputy Hoch arrived when they claim Deputy Short had Zubrod under control.[13]   There is nothing in the record to support this contention.   To the contrary, no reasonable jury could conclude that at that time Deputy Short had Zubrod under control before Deputy Hoch arrived.   The uncontested facts establish that Deputy Short was barely hanging on to Zubrod, who was bucking in an effort to get Deputy Short off of him, and who had tried to stab Deputy Short with needle-nosed plyers.   Deputy Short had hold of Zubrod's wrists, but had been able to attach a handcuff to only one wrist, unfortunately increasing the danger as Zubrod could use the handcuff as a weapon.   Deputy Short was mentally and physically exhausted at this point and did not have control of Zubrod.

---

[13] Indeed, the Court agrees with defendants that many of plaintiffs' statements of additional material facts (Doc. 68-2) are patently unsupported and, in some cases, directly contradicted by the record.   *See* Defendants' Response to Plaintiffs' Statement of Additional Material Facts (Doc. 86-1).

After Deputy Hoch arrived, a tense, uncertain, and rapidly evolving and uninterrupted physical struggled ensued as deputies fought with Zubrod to place him in custody. Throughout this time, Zubrod posed a danger to the deputies, the medical responders, and the victim. And the nature of the criminal conduct was as serious as it gets; attempted murder.

At argument, plaintiffs suggested there was a time after Deputy Hoch's arrival when it should have been clear to him and the other deputies that using a Taser in any mode against Zubrod was so clearly wrong that they should have known it violated Zubrod's constitutional rights. In particular, plaintiffs allege that pivotal point occurred when, toward the end of the struggle, Zubrod was on his back in the bedroom and Deputy Hoch used his Taser in a hybrid drive-stun mode in an effort to get Zubrod to comply with the deputies' efforts to place him in handcuffs. Further, plaintiffs allege that Deputy Hoch continued to use a Taser against Zubrod after he was in handcuffs.

First, the Court finds that the circumstances of this case involved a fluid and continuous resistance by Zubrod to any efforts to place him under arrest. The amount of physical resistance ebbed and flowed throughout the struggle, but he was never compliant and never passive and never obeyed the deputies' commands. There is no question here, and plaintiffs do not seriously contend otherwise, that the deputies were justified in using a Taser when they first encountered Zubrod. And Zubrod continued to resist arrest, sometimes more aggressively than other times, but always resisting. Once officers are justified in using force, as they were here, they can continue to use force until the threat has been neutralized. *Plumhoff v. Richard*, 134 S. Ct. 2012, 2022 (2014) ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.").

The Court can find no bright line during this intense struggle, while a woman lay severely wounded in another room, where any reasonable officer should have concluded that the nature of Zubrod's resistance had changed in such a material respect that the use of a Taser to obtain compliance was suddenly constitutionally prohibited. In any event, it is inappropriate to expect officers in the heat of the moment to parse out, with the wisdom of hindsight, moments during a struggle like this when use of a Taser may or may not be appropriate. *See Nelson v. Cnty. of Wright*, 162 F.3d 986, 991 (8th Cir. 1998) ("Nelson now tries to analyze the brief struggle as if the incident were composed of distinct and separate segments. At the time, however, it was uncertain what would happen next. The situation was tense and 'rapidly evolving.'") (quoting *Graham*, 490 U.S. at 397).

This Court will not accept plaintiffs' invitation to review this case with 20/20 hindsight and second guess the deputies' split-second decisions during this struggle with Zubrod. Whether the deputies could have, for example, overpowered Zubrod through brute force without the use of a Taser is not the question. *See Estate of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (holding that the Eighth Circuit Court of Appeals "has declined to second-guess whether alternative actions by police officers 'might conceivably have been available.'" (quoting *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993)). The question, which the Court answers in the negative, is whether it was an unreasonable, excessive use of force for Deputy Hoch to use a Taser in an effort to place Zubrod under arrest under the exigent circumstances Deputy Hoch faced. Courts "must judge the reasonableness of the force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and we must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation.'" *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (quoting *Graham*, 490 U.S. at 396-97).

Furthermore, the Court does not believe any reasonable jury could find on these facts that Deputy Hoch continued to use a Taser on Zubrod after he was handcuffed. There is no direct evidence that deputies used a Taser against Zubrod after he was handcuffed. The deputies are consistent in their testimony that Zubrod was not Tasered after he was handcuffed. No witness claims to have seen deputies using a Taser against Zubrod after he was handcuffed.

Rather, plaintiffs rely on circumstantial evidence to argue there is a genuine issue of material fact whether deputies used a Taser against Zubrod after he was handcuffed. Plaintiffs argue that, at some point during the video from Deputy Hoch's Taser, Zubrod's hands cannot be seen, which in the light most favorable to plaintiffs gives rise to the conclusion that Zubrod's hands were not visible because he was handcuffed. This is pure speculation. Viewing the facts in the light most favorable to the nonmoving party, however, does not obligate the Court to accept speculation. *See Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008) ("As with any summary judgment motion, while we are required to make all reasonable inferences in favor of the non-moving party, we do not resort to speculation.") The video from the Taser, as described above, does not provide a clear picture of the action because it is constantly moving and its field of vision is often too close to the action to make out much of anything with clarity. The Court cannot draw any nonspeculative inferences from the videos that a Taser was used against Zubrod after he was handcuffed.

Plaintiffs also rely on two, unsworn statements by paramedics who claim Deputy Short escorted them upstairs, and while climbing the stairs, they heard a Taser deployed. Plaintiffs combine these statements with Deputy Short's testimony that law enforcement

officers generally do not want medical personnel present until a suspect is under control, and his testimony that he did not leave the upstairs until Zubrod was in handcuffs, to argue that Deputy Hoch must have Tasered Zubrod after Zubrod was handcuffed. There are several problems with this line of reasoning. First, the Court cannot rely on unsworn statements by the paramedics to establish uncontested facts for purposes of summary judgment. A motion for summary judgment and a resistance to such a motion must be based on admissible evidence. FED. R. CIV. P. 56(c)(4) (affidavits in resistance to summary judgment must be based on admissible evidence). *See also Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) ("In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'") (quoting *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993)). There is good reason for this. For example, it is not clear from these statements how the paramedics knew Deputy Short from any other deputy, or how they knew the sound of a Taser deployment, or what they actually saw when they came to the second floor of the house and whether it was consistent with Zubrod being Tasered after he was handcuffed. Second, the uncontested evidence is that medical personnel were upstairs, at Deputy Hoch's insistence, while deputies were still fighting with Zubrod. Third, Deputy Short made it clear in his testimony that while it is preferable to have medical personnel away from the scene until a suspect is under control, he did not recall in this particular case whether that happened and has no recall of going downstairs to escort medical personnel upstairs. Thus, although plaintiffs argue this is a material fact in dispute that should preclude entry of summary judgment, the Court finds that it is not a genuine issue because it relies on inadmissible evidence and a speculative line of

reasoning based on assumptions which are not borne out by the rest of the uncontested facts.

In assessing excessive use of force, the Court must consider the outcome of the use of force. Here, in the light most favorable to plaintiffs, the evidence would establish that a Taser can have some impact in increasing heart rate and causing other physiological changes that, combined with Zubrod's heart condition and methamphetamine intoxication and physical altercation with the deputies, contributed to his death. Even accepting this causal chain as true, the Court does not find this factor leads to the conclusion that Deputy Hoch's use of the Taser constituted excessive use of force. The Taser was, at most, a contributory factor in Zubrod's death, which appears primarily to be the result of his long-term abuse of methamphetamine that caused him to have an enlarged heart and his acute methamphetamine intoxication. This is not the type of causal linkage that could lead a reasonable jury to conclude that using a Taser on Zubrod constituted an excessive use of force.

Plaintiffs emphasize that Zubrod had a history of mental illness and was high on methamphetamine when deputies used a Taser on him, and that made its use excessive. Plaintiffs argue that the deputies knew, or should have known, that Zubrod's behavior could only be explained by the fact he was mentally ill and/or high on a drug. Plaintiffs further argue that Taser warnings indicate, and the deputies knew from training, that Tasers may not be effective on subject suffering from mental illness or high on drugs, and that Tasers may cause greater injury to a person under the influence of drugs. The Court does not find that this alters whether Deputy Hoch's use of a Taser was unreasonable. First, there is no evidence that any of the deputies knew Zubrod, knew he had a mental illness, knew he had a history of drug use, or knew he was under the influence of drugs. *See McKenney*, 635 F.3d at 360 (rejecting an excessive use of force

argument that officers should have made sure the mentally ill suspect was mentally capable of understanding commands before deploying a Taser because there was nothing in the record to suggest the officers knew the suspect was mentally retarded or facts that should have led them to that conclusion). Second, the case law is clear that officers can continue to use force even against someone they know to be mentally ill or on drugs when the person nevertheless continues to actively resist arrest. *Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled person."); *Hassan v. City of Minneapolis*, Minn., 489 F.3d 914, 919 (8th Cir. 2007) (holding that even if officers knew the suspect was mentally ill, the suspect's "mental state does not change the fact he posed a deadly threat to the officers and the public" justifying the use of force).

Finally, plaintiffs emphasize the number of Taser deployments within a short window of time and argue that it was excessive, in part because it exceeded the number and duration used in any lab testing of Tasers. First, although the uncontested facts show that the deputies attempted to use a Taser against Zubrod more than a dozen times, it does not establish how many times they were successful. When Deputy Short deployed his Taser against Zubrod, he missed. Deputy Short also did not succeed in using his Taser against Zubrod in drive-stun mode before Zubrod knocked the Taser out of Deputy Short's hand or Deputy Short dropped it. Similarly, the first time Deputy Hoch deployed his Taser, no connection was made because one of the two barbs hit Zubrod's leather belt. The medical examiner's report shows there was no indication these barbs made contact with Zubrod's skin. Plaintiffs again engage in impermissible speculation by asserting that a barb can conduct electricity when it is close to a body, even if it is not in contact with the skin. Although this may be true in theory, there is

no evidence in this record that it occurred here. The uncontested evidence also established that Deputy Smith's Taser malfunctioned. Finally, although Deputy Hoch was able to deploy his Taser and hit Zubrod in the leg, the barbs were too close to cause neuromuscular incapacitation. Deputy Hoch then attempted to use his Taser in drive-stun mode while the barbs were still attached, which in this hybrid deployment could, in theory, cause neuromuscular incapacitation. The uncontested facts establish, however, that Zubrod never experienced neuromuscular incapacitation. It is also uncontested that as Deputy Hoch attempted to deploy his Taser in drive-stun mode, Zubrod attempted to push it away from his body. So, in the end, it is unclear how many of the trigger pulls actually occurred when the Taser had contact with Zubrod's body. Taking the evidence in the light most favorable to plaintiffs, however, the Court will assume that Deputy Hoch's Taser had contact with Zubrod on each of the ten trigger pulls registered on his Taser. The Court still does not find this to constitute an excessive use of force because Zubrod continued to resist arrest after having attempted to murder a woman in the next room. *See*, *De Boise*, 760 F.3d at 897-98 (finding a reasonable officer would not have been on notice that eight Taser deployments and two drive-stun uses of a Taser constitute excessive use of force where the suspect continued to resist arrest).

On December 16, 2016, plaintiffs filed a Notice of Additional Authority (Doc. 90). Plaintiffs cite *Moore v. City of Ferguson, Missouri*, No. 4:14-CV-1443 SNLJ, 2016 WL 579161 (E.D. Mo. Oct. 4, 2016) for "additional authority relating to the issues presented in the motion and resistance to summary judgment." Doc. 90 at 1. Plaintiffs did not seek leave of the Court to submit additional authority, nor is there any provision for submitted additional authority under Local Rule 56 once the Court has taken the case under advisement. Moreover, this authority was available to plaintiffs at the time they

filed their resistance. In any event, the Court finds *Moore* unpersuasive and factually distinguishable from the facts here.

In *Moore*, the court stated that the officers' version of the events "makes the use of force sound reasonable . . . but the data from the Taser itself tells a somewhat different story." *Id.* at *3. The data showed four cycles of Tasing for a total duration of 21. *Id.* at *2. The court concluded that is was "a question for a jury whether or not one to two seconds constitutes a reasonable amount of time to allow someone to recover from the electrical shock of a 50,000 volt, five-second-long Tasing cycle, give a command to stay on the ground, and observe whether or not the individual complies or resists commands." This case is easily distinguishable from *Moore*. First, unlike in *Moore*, Zubrod was never subjected to a Tazing cycle; at most, he was subject to a hybrid tasing using the Taser in drive-stun mode while probes were attached to his leg. The undisputed evidence is that, unlike the subject in *Moore*, Zubrod never experienced neuromuscular incapacitation. Further, in *Moore* the evidence showed that, at most, *Moore* was attempting to rise after beings Tased three times when officers tased him again. In contrast, Zubrod continued to violently fight with officers over a long period of time. Finally, the Taser videos here are not inconsistent with the officers and other witness accounts of the scene. Unlike in *Moore*, here no evidence from the Tasers contradicts the deputies' accounts of their encounter with Zubrod.

In arriving at the conclusion that Deputy Hoch did not use excessive force, the Court has taken into account the circumstances existing throughout Deputy Hoch's contact with Zubrod. A woman lay bloody and moaning in an adjoining bedroom and Zubrod continued to make statements about killing her. The admissible evidence shows that Zubrod had a single handcuff on one wrist; it is uncontested that a suspect with only one handcuff attached poses a danger to law enforcement officers because it can be used

as a weapon. Zubrod continued to resist officers physically, kicking at them and swinging at them, including with a curtain rod. Zubrod refused to comply with deputies' commands to allow them to place him in handcuffs. And Zubrod was never incapacitated by the use of the Taser at any point. Until Zubrod was secured in handcuffs, he continued to pose a safety threat both to the victim and to the deputies.

The Court has also considered plaintiffs' various assertions that factual disputes exist about various details, such as whether Zubrod was sitting or standing when swinging the curtain rod. The Court finds the facts set forth above are the material facts relevant to whether Deputy Hoch used excessive force. Whether there are minor factual disputes about material facts, or major disputes about immaterial facts, it does not prevent entry of summary judgment. *See*, *e.g.*, *Scott*, 550 U.S. at 380 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphases in original) (citation omitted); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (noting that "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," and a plaintiff cannot avoid dismissal by creating a "weak issue of fact"). The Court finds no genuine issues of fact material to its analysis.

In summary, the Court finds that the *Graham* factors demonstrate that Deputy Hoch did not use excessive force. The severity of the crime Zubrod committed, attempted murder, was extremely severe. Zubrod posed an immediate threat to the deputies, medical personnel, and the victim. Finally, Zubrod was neither passive, nor fleeing; he was actively resisting arrest. This is precisely the type of case where courts cannot use 20/20 hindsight to second-guess law enforcement officers' split-second decision making during a fluid and evolving effort to arrest a violent and resisting suspect

who attempted to murder a woman.   This is a case where Deputy Hoch's use of a Taser in these circumstances was objectively reasonable.   Therefore, the Court grants summary judgment in favor of defendant Deputy Hoch with respect to Counts I and II of plaintiffs' complaint.

### B.      Whether Deputy Hoch is Entitled to Qualified Immunity

Should a higher court find this Court erred in its conclusion that Deputy Hoch did not use excessive force, then the analysis turns to whether Deputy Hoch is nevertheless entitled to qualified immunity.   In other words, even if a court now finds Deputy Hoch used excessive force, he is still immune from suit if it was not clearly established at the time of his conduct that it constituted a violation of Zubrod's constitutional rights.   As the Eighth Circuit Court of Appeals has explained;

> To determine the question of qualified immunity, we engage in the following two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. . . .   Courts have discretion to decide which part of the inquiry to address first.

*De Boise*, 760 F.3d at 896 (internal quotation marks and citations omitted).   Having concluded under the first part that plaintiffs have not made out a violation of Zubrod's constitutional rights, the Court turns to the second part of the inquiry.

The pertinent question in the second part of the inquiry is whether in September 2013, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   *Shekleton v. Eichenberger*, 677 F.3d 361, 367 (8th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).   The Court finds no reasonable

officer would have clearly known that using a Taser against Zubrod in the situation Deputy Hoch faced was unlawful.

Plaintiffs have cited no case holding that a law enforcement officer's use of a Taser in the situation facing Deputy Hoch was a clear violation of law, let alone that such law clearly existed in September 2013.   Rather, plaintiffs argue that use of a Taser on a non-resisting individual violates a clearly established right.   Doc. 68, at 14.   Zubrod was not a non-resisting individual.   Plaintiffs then argue that "[a]t a more basic level, however, is the basic right simply to be free from excessive force."   *Id*.   This is precisely the type of analysis at a high-level generality that fails to account for the factual circumstances facing the law enforcement officer.   Plaintiffs' reliance on cases from other circuit courts of appeal (Doc. 68, at 16-17) is equally unavailing.   Even assuming circuit precedent is sufficient for purposes of qualified immunity analysis to constitute clearly established law, that cannot be stretched to include other circuits absent a clear consensus.   *Wilson v. Layne*, 526 U.S. 603, 616-17 (1999).   More recent Supreme Court decisions cast some doubt on whether even circuit precedent can constitute clearly established law for purposes of qualified immunity.   *See*, *e.g.*, *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (assuming for the sake of argument that a right can be "clearly established" by circuit law, finding that the right was not established by circuit precedent in this case); *City and Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015) (same).   In any event, the cases from other circuit courts of appeal upon which plaintiffs rely are not sufficiently factually similar to clearly establish that Deputy Hoch's conduct was unconstitutional, even if they did control.

A law enforcement officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the [officer's] shoes would have understood that he was violating it . . . .   In other

words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Plumhoff*, 134 S. Ct. at 2023 (internal citations omitted). Therefore, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Taylor*, 135 S. Ct. at 2044 (alteration in original) (internal quotation omitted). Neither Supreme Court precedent, nor Eighth Circuit precedent, has sufficiently defined when or how many times a law enforcement officer may use a Taser on a person resisting arrest. Indeed, the Eighth Circuit has recognized this area remains undefined. *De Boise*, 760 F.3d at 897 ("[W]e have yet to determine whether a violent subject, acting aggressively toward officers, has a clearly established right to be free from multiple tasings.").

Accordingly, the Court finds that Deputy Hoch is entitled to qualified immunity, even if a higher court concludes, in hindsight, that his use of a Taser multiple times against Zubrod in these circumstances constituted excessive force. If it did, the law was not so clearly established in September 2013 that a reasonable officer in Deputy Hoch's shoes would have clearly understood that his conduct was unlawful. Therefore, the Court alternatively grants summary judgment in favor of defendant Deputy Hoch with regard to Counts I and II of plaintiffs' complaint because he is entitled to qualified immunity.

### C. *Whether Deputies Short and Smith are Liable for Failing to Intervene*

The third issue before the Court is whether Deputies Short and Smith are liable if Deputy Hoch used excessive force because they failed to intervene. The Court finds they are not.

Deputies Short and Smith can be liable for injuries to Zubrod only if they breached a duty to intervene where they observed Deputy Hoch violating Zubrod's constitutional

rights. "[A]n officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment." *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009) (citing *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009)). To be liable under this theory, the evidence must show "the officer is aware of the abuse and the duration of the episode is sufficient to permit an inference of tacit collaboration." *Krout*, 583 F.3d at 565.

There is nothing in this record that would support a finding of liability for nonfeasance by Deputies Short and Smith. The Court found, above, that Deputy Hoch did not use excessive force against Zubrod. Therefore, logic dictates that Deputies Short and Smith cannot be held liable for failing to intervene where no constitutional violation occurred. *See Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) ("Here, because it was not clearly established that McCallum's actions constituted excessive force, a reasonable officer was not on fair notice that his failure to intervene when McCallum deployed the Taser violated Hollingsworth's Fourth Amendment rights.").

Even assuming the Court is wrong and a higher court concludes Deputy Hoch used excessive force against Zubrod, the evidence does not support a finding that Deputies Short and Smith are liable for failing to intervene. With regard to Deputy Short, the evidence established that he was so mentally and physically exhausted, and so engaged in the continued struggle to control Zubrod, that he did not hear Deputy Hoch using the Taser against Zubrod during the time Zubrod was on his back resisting the deputies. Even assuming Deputy Short was or should have been aware of Deputy Hoch using a Taser against Zubrod, the situation facing Deputies Short and Smith was a fluid and continuing struggle to control Zubrod as he actively resisted arrest. The Court simply cannot find that any reasonable jury would conclude that a reasonable officer in Deputies

Short's or Smith's shoes would recognize that Deputy Hoch was violating Zubrod's constitutional rights. Nor is there a basis for a reasonable jury to conclude that Deputies Short or Smith had an opportunity to intervene in the midst of their own struggle to obtain control over Zubrod, even if they recognized a constitutional violation. *See Robinson v. Payton*, 791 F.3d 824, 830 (8th Cir. 2015) (finding it significant, in rejecting a finding that a trooper had a duty to intervene, that the trooper was himself engaged with the suspect and not simply standing back and observing the actions of another officer).

Alternatively, the Court finds that Deputies Short and Smith are entitled to qualified immunity for the same reasons it finds, alternatively, that Deputy Hoch is entitled to qualified immunity. The law regarding the use of a Taser against a subject who was physically resisting arrest was not so clearly established in September 2013 that these deputies could have so clearly known that Deputy Hoch was violating Zubrod's constitutional rights that it triggered an obligation to intervene.

Accordingly, the Court grants summary judgment in favor of defendants Deputies Short and Smith with respect to Count III of plaintiffs' complaint.

### D.    *Whether Sheriff Langenbau and Worth County Are Vicariously Liable*

In Count VI of their complaint, plaintiffs claim Sheriff Langenbau and Worth County are vicariously liable for the actions of Deputies Hoch, Short, and Smith. Doc. 2, at 14. Read broadly, this count asserts vicarious liability not only with respect to the state law negligence claim (Counts IV & V), but with respect to the Section 1983 claims against the deputies in Counts I through III. Accordingly, the Court will address whether, under Section 1983, the Sheriff and County can be held vicariously liable for the conduct of their deputies.

The doctrine of respondeat superior provides that an employer is liable for the conduct an employee committed while the employee is acting within the scope of employment. *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999). "A claim of vicarious liability under the doctrine of respondeat superior rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment." *Id.* (internal quotation marks and citation omitted).

Respondeat superior cannot be a basis of liability, however, under Section 1983. *See*, *e.g.*, *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) ("In general, a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents on a respondeat superior theory of liability.") (internal quotation marks and citation omitted); *Givens v. Jones*, 900 F.2d 1229, 1233 (8th Cir. 1990) (holding that respondeat superior liability is not a basis for liability of supervisors under § 1983). Plaintiffs have not brought a claim alleging they suffered damages because the Sheriff or County failed to adequately or properly train the deputies in the use of a Taser.[14] Rather, plaintiffs rely entirely on a theory of respondeat superior to establish the Sheriff's and County's liability. That is not a viable legal theory under Section 1983.

In any event, the Court has found that none of the deputies violated Zubrod's constitutional rights. The Eighth Circuit Court of Appeals has "long held that neither municipal nor supervisory liability may attach in section 1983 actions unless individual liability is first found on an underlying substantive claim." *Schoettle*, 788 F.3d at 861-62 (citing *Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011)).

---

[14] In their statement of additional material facts (Doc. 68-2), plaintiffs devoted a large number of paragraphs to the training the deputies received or did not receive regarding tasers. Because plaintiffs have made no claim of fault based on training, the Court did not include those facts in its findings.

Accordingly, the Court grants summary judgment to the extent plaintiffs' Count VI alleges the Sheriff and County are vicariously liable for the deputies' violations of Zubrod's constitutional rights pursuant to their § 1983 claims in Counts I through III. The Court declines to address the Sheriff's and County's vicarious liability for the deputies' alleged assault and battery (Count IV) or negligence (Count V) because, as explained below, the Court declines to exercise jurisdiction over plaintiffs' state law claims.

### E. Jurisdiction Over Plaintiffs' State Law Claims

In Count IV, plaintiffs make a state law claim alleging Deputy Hoch committed assault and battery, and in Count V, plaintiffs make a state law claim alleging Deputies Hoch, Short, and Smith were negligent. Jurisdiction over plaintiffs' state-law claims— which would be the only claims remaining because the Court has granted summary judgment with respect to the remaining Counts—was invoked solely pursuant to the supplemental jurisdiction statute, 28 U.S.C. § 1367. Section 1367 provides a federal court with jurisdiction over state-law claims forming part of the same "case or controversy" as the federal claims. Having disposed of all of plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over his state-law claims. *See* 28 U.S.C. § 1367(c)(3) (court may, *sua sponte*, decline to exercise supplemental jurisdiction over pendent state-law claims if it has dismissed all claims over which it had original jurisdiction). Where, as here, all federal claims are dismissed prior to trial, the balance of factors to be considered in deciding whether to exercise supplemental jurisdiction over pendent state-law claims typically militates against exercising such jurisdiction. *See, e.g., Johnson v. City of Shorewood, Minn.*, 360 F.3d 810, 819 (8th

Cir. 2004) (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). That is the case here. Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiffs' claims for assault and battery (Count IV) and negligence (Count V), which the Court will dismiss without prejudice.

## F. Plaintiffs' Loss of Consortium Claim

In Count VII, plaintiffs made a claim for loss of consortium. The tort of loss of consortium cannot lie against a defendant when the defendant is not liable to the plaintiffs. *See James ex rel. James v. Burlington Northern, Inc.*, 587 N.W.2d 462, 464-65 (Iowa 1998) (dismissing plaintiff's loss of consortium claim against defendant after defendant held not liable). Plaintiffs' right to recover for loss of consortium is derivative only of the first five counts of their complaint. Because the Court grants summary judgment against plaintiffs on the underlying federal claims in Counts I through III, plaintiffs cannot recover damages for loss of consortium for those Counts. Accordingly, the Court grants summary judgment in favor of all defendants with regard to Count VII to the extent it rests on alleged violations in Counts I through III.

## IX. CONCLUSION

For the reasons set forth herein, the Court **grants** defendants' motion for summary judgment (Doc. 41):

1. Plaintiffs' claims pursuant to Title 42, United States Code, Section 1983 against all defendants (Counts I, II, and III) are hereby *dismissed with prejudice*;

2. Plaintiffs' claims in Counts VI and VII, to the extent they assert causes of action dependent on plaintiffs' Section 1983 claims, are also hereby *dismissed with prejudice*;

3. The Court exercises its discretion under 28 U.S.C. § 1367(c)(3), declines jurisdiction over the plaintiff's remaining state law claims (Counts IV, V, VI, & VII). Accordingly, plaintiffs' state law claims in Counts IV, V, VI and VII are *dismissed without prejudice*.

**IT IS SO ORDERED** this 8th day of January, 2017.

_____
C.J. Williams
United States Magistrate Judge
Northern District of Iowa